# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID IGASAKI, | ) |
| Plaintiff, | ) |
| | ) No. 15-cv-03693 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| ILLINOIS DEPARTMENT OF FINANCIAL | ) |
| AND PROFESSIONAL REGULATIONS, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Igasaki worked as an attorney for the Illinois Department of Financial and Professional Regulations ("IDFPR") until his termination in March 2015. Igasaki claims that he was unlawfully terminated because of his race, sexual orientation, and age, and in retaliation for engaging in protected activity. He further claims that IDFPR did not reasonably accommodate his disability. Accordingly, he has filed a complaint stating claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* IDFPR now moves for summary judgment on all claims. (Dkt. No. 79.) For the following reasons, IDFPR's motion is granted.

## BACKGROUND

### I. Federal Rule of Civil Procedure 56 and Local Rule 56.1

Before summarizing the material facts, the Court must first address Igasaki's counsel's violations of both Federal Rule of Civil Procedure 56 and Northern District of Illinois Local Rule 56.1. Federal Rule 56 and Local Rule 56.1 set forth the manner in which parties are required to

present their factual assertions when supporting or opposing a motion for summary judgment.

Under Federal Rule 56(c):

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). In addition, the rule allows a party to object that the material supporting or disputing a fact "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Where a party fails to properly support an assertion of fact or address another party's factual assertion, the court may afford the party the opportunity to properly support or address the fact, consider the fact undisputed for purposes of the motion, or grant summary judgment if the motion and facts, including those considered undisputed, show that the movant is entitled to it. Fed. R. Civ. P. 56(e).

Local Rule 56.1 requires the party moving for summary judgment to submit a statement of material facts that it contends are undisputed and entitle it to summary judgment. L.R. 56.1(a)(3). The statement of facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, part of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). On the other hand, the party opposing summary judgment must file a "concise response to the movant's statement." L.R. 56.1(b)(3). The response should respond to each numbered paragraph in the moving party's statement and where the opposing party disputes a fact, it must include specific references to the

affidavits, parts of the record, or other supporting materials relied on to controvert the fact. *Id.* Notably, Local Rule 56.1 does not allow the non-moving party to set forth non-responsive additional facts in its response to the statement of material facts. *De v. City of Chicago*, 912 F. Supp. 2d 709, 714–15 (N.D. Ill. 2012). To the extent the opposing party wishes to submit any additional facts, it must do so by submitting a separate statement of additional facts in a similar format to the moving party's statement of facts. L.R. 56.1(b)(3)(C); *De*, 912 F. Supp. 2d at 715 ("It is improper, and a violation of Local Rule 56.1, for the nonmoving party to add additional facts to his Local Rule 56.1(b)(3)(B) response; the nonmoving party's additional facts belong in a ***separate*** statement."). District courts are "entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Consequently, a district court is empowered to penalize non-compliance by striking improperly submitted additional facts or deeming admitted facts to which a party has not properly responded. *See De*, 912 F. Supp. 2d at 711–16.

Igasaki's counsel violated both Rule 56 and Local Rule 56.1 in numerous ways. First, Igasaki's response to IDFPR's statement of material facts disputes the vast majority of IDFPR's facts. Yet, many of the responses fail actually to controvert IDFPR's factual allegations. Local Rule 56.1 "is not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (interpreting the local rule that was later renumbered as L.R. 56.1). For example, IDFPR states that, "Plaintiff's 2013 job performance evaluation detailed specific incidents where Plaintiff needed improvement including an incident that resulted in a pre-disciplinary memorandum where Plaintiff failed to enforce a law that requires permanent revocation of a medical license based on certain types of convictions." (Def.'s Rule 56.1 Statement of Uncontested Facts ("SUF") ¶ 26,

Dkt. No. 81.) In response, Igasaki attacks the exhibit supporting that statement of fact for failing to "include any supporting documents, including an alleged 'pre-disciplinary memo' referred to in the 2013 Review [and] disputes the entirety of the 2013 job performance and all allegations contained in Paragraph 26." (Pl.'s Resp. to Def.'s Rule 56.1 Statement ("PRSF") ¶ 26, Dkt. No. 92.) That response does nothing to address the substance of IDFPR's factual assertion. It simply makes an (unfounded) attack on the evidence supporting the factual statement and disagrees with Igasaki's former employer's subjective evaluation. Similarly deficient responses abound throughout Plaintiff's response. Thus, in those many instances where Igasaki has failed squarely to dispute an asserted fact, the fact will be treated as admitted.

In other instances, Igasaki's responses cite evidence in the record purportedly creating a genuine dispute of material fact, but closer examination reveals that Igasaki's counsel has mischaracterized the evidence. Igasaki's counsel also resorts to speculation to dispute certain facts. However, "[s]peculative assertions are improper under Local Rule 56.1." *De*, 912 F. Supp. 2d at 714. Most prominently, she seeks to rebut IDFPR's factual assertions denying that Igasaki's supervisor knew of his sexual orientation by ascribing that knowledge to her based on her close relationship with another IDFPR employee. (PRSF ¶¶ 60–61.) According to the response, the supervisor must have known about Igasaki's sexual orientation because the other employee knew of it, and he certainly would have told the supervisor. (*Id.*) Such speculation cannot bring a fact into dispute, and accordingly any facts rebutted by pure speculation are deemed admitted.

In addition, Igasaki's counsel often introduces new facts in her responses to IDFPR's statement of material facts. Again, a response to a statement of material facts should not contain additional facts that do not meet the substance of the moving party's asserted facts. Any new facts

must be introduced in a separate statement of additional facts. Consequently, such non-responsive additional facts are stricken and will not be considered by the Court.

Finally, Igasaki's counsel declined to submit a statement of additional facts altogether. Yet, not only does she attempt to introduce new facts in her response to IDFPR's statement of material facts, she also introduces new facts in the opposition brief. Citing directly to new facts in the opposition brief is a clear violation of Local Rule 56.1, which "***requires specifically*** that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement of any additional facts that require the denial of summary judgment." *Cicho v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005) (internal quotation marks and alteration omitted). The Court would be well within its discretion to disregard all additional facts introduced in the opposition brief. *Id.* at 809–10. In this instance, however, the Court will forgive this particular Local Rule 56.1 violation and exercise its discretion to consider the additional facts improperly presented in the opposition brief. As will be explained further, even considering those facts, Igasaki cannot prevail on any of his claims. Thus, IDFPR is not prejudiced by its inability to respond to the additional facts. Notwithstanding the Court's leniency in not striking the new facts, many of the new facts still will not be considered here because they are either not supported by the evidence in the record or supported by evidence that cannot be presented in an admissible manner at trial. Thus, only the new facts that are properly supported will be considered.

## II. Factual Background

The following facts are undisputed, deemed admitted due to Igasaki's counsel's Rule 56 and Local Rule 56.1 violations, or were introduced in Igasaki's opposition brief and supported by admissible evidence in the record.

David Igasaki is a gay Asian male who was over the age of forty at all relevant times. (PRSF ¶ 53; Pl.'s Opp'n at 10, Dkt. No. 91.) He also suffers from gout. (Pl.'s Opp'n at 10.) Igasaki worked at the Medical Prosecutions Unit of IDFPR as an advanced program specialist—also known as a staff attorney. (*Id.* ¶ 5.) He began working at IDFPR on January 10, 1994, and his job duties included preparing for disciplinary proceedings, participating in settlement conferences, and trying administrative hearings. (*Id.* ¶¶ 5–6.)

Laura Forester assumed the position of IDFPR's Chief of Medical Prosecutions on February 11, 2011. (*Id.* ¶ 7.) By virtue of her position, Forester was Igasaki's direct supervisor. (*Id.*) Forester conducted her first performance evaluation of Igasaki near the end of 2011. (*Id.* ¶ 8.) Her 2011 evaluation rated Igasaki as either exceeding expectations or meeting expectations in all categories. (*Id.* ¶ 9.) However, the following year, Igasaki saw a marked deterioration in his performance evaluation. (*Id.* ¶ 10.) In his 2012 evaluation, Forester rated Igasaki as needing improvement in "job knowledge," "productivity," "quality," "initiative," "use of time," "planning," and "follow-up." (*Id.*) Moreover, Forester provided specific examples of instances where Igasaki's performance fell short of her expectations. Among other issues, she pointed to "'an inexplicable delay' in processing the discipline in a matter," "Medical Disciplinary Board members rejecting 'several' consent orders for 'drafting deficiencies and/or impropriety of the proposed disposition,'" and maintaining an unacceptably disorganized office space.[1] (*Id.* ¶ 11.)

Following the 2012 evaluation, Igasaki was placed on a six-month Corrective Action Plan on February 19, 2013. (*Id.* ¶ 16.) The Corrective Action Plan listed twelve requirements for

---

[1] Throughout his response to IDFPR's statement of material facts, Igasaki disputes Forester's negative evaluations. The basis for his dispute is his insistence that his performance had not declined from previous years when his evaluations indicated he was either meeting or exceeding expectations. However, Igasaki's "own evaluation of his work cannot be imputed to" his employer and therefore is not sufficient to create a genuine dispute of material fact concerning his negative performance reviews. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 22*, 657 F.3d 595, 603 (7th Cir. 2011).

improvement and warned Igasaki that failure to abide by any of those requirements could result in discipline. (*Id.* ¶ 17.) Six months later, the Corrective Action Plan was renewed with the same twelve requirements. (*Id.* ¶ 18.) The renewed Corrective Action Plan also provided specific examples of instances where Igasaki failed to comply with the original plan's directives. (*Id.*) Overall, the renewed plan noted that Igasaki had made no progress on eight of the original plan's twelve requirements. (*Id.* ¶ 19.) In addition, Igasaki was orally reprimanded on August 28, 2013 for "unsatisfactory performance" and "incompetence or inefficiency in the performance of an assigned duty." (*Id.* ¶ 22.) Then, on December 20, 2013, Igasaki received a written reprimand for incompetence and inefficiency in the performance of his duties. (*Id.* ¶ 24.) His performance evaluation for 2013 rated Igasaki as needing improvement in all categories. (*Id.* ¶ 25.) Furthermore, the evaluation cited specific incidents where Igasaki's performance fell short of expectations, such as an instance where Igasaki failed to enforce a law requiring the permanent revocation of a medical license based on certain types of convictions. (*Id.* ¶ 26.) The evaluation also referred to multiple instances where Igasaki was observed sleeping at work. (*Id.* ¶¶ 27–28.)

Igasaki's Corrective Action Plan was again renewed for another six months on February 13, 2014. (*Id.* ¶ 30.) The renewed plan indicated that progress had been made on seven of the twelve requirements, but nonetheless there was not improvement with respect to the other five. (*Id.*) Again, for the directives where Igasaki had not shown improvement, the Corrective Action Plan provided specific examples of his deficient performance. (*Id.* ¶ 31.) Among the issues identified were Igasaki's failure to meet fifty deadlines between August 2013 and February 2014, his failure to provide a Medical Board Member a critical document before an informal conference, falling asleep at work, and maintaining a cubicle so disorganized it was difficult to locate files. (*Id.*) Forester also noted that she had to reassign a case due to Igasaki's lack of preparation for an

imminent proceeding. (*Id.*) Igasaki was put on a ten-day suspension on June 2, 2014 due to incompetence and inefficiency in performing his duties. (*Id.* ¶ 38.) His Corrective Action Plan was renewed on September 2, 2014 for five months, again with the same twelve requirements for improvement. (*Id.* ¶ 39.) On October 23, 2014, he received a second ten-day suspension, this time for insubordination. (*Id.* ¶ 40.)

Once again, Igasaki was rated as needing improvement in all categories in his 2014 performance evaluation. (*Id.* ¶ 41.) The evaluation explained that over the year, Igasaki demonstrated a lack of knowledge on how to acquire experts, hastily and poorly drafted complaints, allowed respondents' attorneys to delay resolution of a disciplinary case, and fell asleep during work hours. (*Id.* ¶ 42.) Forester provided Igasaki feedback on his Corrective Action Plan on January 26, 2015. (*Id.* ¶ 43.) She noted that he had failed to make progress on six of the requirements. (*Id.*) Ultimately the Corrective Action Plan was not renewed. (*Id.*) Instead, Igasaki was terminated on March 23, 2015 due to the recurring issues identified in both his Corrective Action Plan and his performance evaluations. (*Id.* ¶ 45.)

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Igasaki has set forth five employment discrimination claims against IDFPR. He alleges three claims under Title VII for discrimination on the basis of race and sex (specifically, sexual orientation), as well as retaliation for engaging in a protected activity. In addition, he sets forth an age discrimination claim under the ADEA and a disability discrimination claim under the ADA.

## I. Race, Age, and Sex Discrimination Claims

Because Igasaki's race, sex, and age discrimination claims arise from the same set of facts, the Court will address them together. Courts in this Circuit assess Title VII claims as well as ADEA claims by considering "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Little v. Ill. Dep't of Pub. Health*, No. 16-CV-10377, 2017 WL 5903835, at *7 (N.D. Ill. Nov. 30, 2017) ("The test for ADEA discrimination is virtually identical to the framework for Title VII discrimination." (internal quotation marks omitted)); *see also Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (holding that discrimination on the basis of sexual orientation is a form of sex discrimination under Title VII). One way of proving a claim is through the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). This framework allows a Title VII or ADEA plaintiff to set out a *prima facie* case for discrimination by showing that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees outside of his protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *David*, 846 F.3d at 225. If a plaintiff's evidence establishes a *prima facie* case of unlawful discrimination, "the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). Where the employer carries its burden, the burden shifts back to the plaintiff to establish that the employer's stated non-discriminatory reason is a pretext. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015).

As an initial matter, the only adverse employment action at issue with respect to Igasaki's race, sex, and age discrimination claims is his termination. IDFPR addressed why termination was the only actionable adverse employment action in its memorandum in support of its motion for summary judgment. (Def.'s Mem. in Support of Summ. J. at 3–4, Dkt. No. 80.) In his opposition, Igasaki fails to counter IDFPR's argument on this issue and therefore has waived his ability to argue that he suffered any adverse employment actions other than termination. *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).

Moreover, the Court can quickly conclude that Igasaki has failed to set out his *prima facie* case under the *McDonnell Douglas* burden-shifting framework. One of the elements of the *prima facie* case requires Igasaki to show that similarly-situated employees outside of his protected class were treated more favorably. While Igasaki attempts to argue this point, he fails to identify any specific individuals as comparators. Yet, a plaintiff cannot simply state that he is similarly situated to every one of his colleagues. *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*, 48 F. Supp. 3d 1054, 1104–05 (N.D. Ill. 2014). Rather, it is "well established that a plaintiff must provide ***specific evidence and specific examples*** of employees who have been treated more favorably to establish" the similarly-situated element. *Dority v. City of Chicago*, No. 98 C 4893, 2001 WL 1155286, at *14 (N.D. Ill. Sept. 28, 2001) (emphasis added). Igasaki's failure to identify specific comparators prevents the Court from meaningfully engaging in the similarly-situated inquiry, as it cannot discern whether there are enough common features between Igasaki and his coworkers to allow a comparison. *See Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). For that reason, he cannot establish a *prima facie* case under *McDonnell Douglas*.

Nonetheless, Igasaki may still be able to defeat summary judgment if the evidence, viewed as a whole, would allow a reasonable juror to conclude that his race, sexual orientation, or age caused his termination. *Ortiz*, 834 F.3d at 765. In the case of his race and sexual orientation discrimination claims, Igasaki need only show that his race or sexual orientation was a motivating factor in his termination. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009). On the other hand, for his age discrimination claim he must show that his age was the "but-for" cause of IDFPR's decision to terminate him. *Id.* at 176.

Here, Igasaki presents no evidence to show that his race, sexual orientation, or age played any role whatsoever in his termination. Even when viewed in the most favorable light possible, his evidence shows that, at most, he was treated unfairly and unprofessionally by his supervisor, Forester. For example, Igasaki claims that Forester yelled at him but not other employees for working late. (Opp'n at 4.) He also accuses her of undermining his ability to perform his duties. (Opp'n at 7.) However, Igasaki is unable to connect his treatment to any discriminatory animus on Forester's part. Indeed, he concedes that he did not specifically know "what discriminatory reason [Forester] had" for treating him harshly. (PRSF ¶ 52.) Thus, he has put forward no evidence suggesting that Forester (or any decisionmaker at IDFPR) harbors any prejudice toward Asians, gay men, or older employees.[2] Without such evidence, Igasaki cannot defeat summary judgment.

---

[2] Igasaki does attempt to introduce evidence of age discrimination by pointing to an interaction he had with a colleague who supposedly had a close relationship with Forester. That colleague apparently asked Igasaki when he planned to retire and "seemed very displeased" when Igasaki responded that he intended to work until he is seventy. (Opp'n at 10.) Of course, the co-worker's apparent displeasure over Igasaki's intention to continue working, standing alone, has no probative value as to whether IDFPR discriminated against older employees. *See Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 921, 931 (N.D. Ill. 2014) ("Derogatory remarks made by a non-decisionmaker or someone without influence generally do not suffice as evidence of discriminatory intent." (internal quotation marks omitted)). Moreover, there is no evidence indicating that the co-worker had any role in Igasaki's termination. While Igasaki seems to impute the co-worker's "animus" to Forester, he does so solely through speculation and conjecture. That is not sufficient to defeat summary judgment. *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) ("[O]ur favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." (internal quotation marks and alteration omitted)).

Neither Title VII nor the ADEA protect an employee from having a difficult boss. The statutes do not impose a "'general civility code' designed to purge the workplace of all boorish or even harassing conduct." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001). Instead, they proscribe only workplace discrimination based on a protected status. *Id.*; *see also McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358 ("The ADEA and Title VII share common substantive features and also a common purpose: the elimination of discrimination in the workplace." (internal quotation marks omitted)).

By contrast, IDFPR has ample uncontroverted evidence showing that it had legitimate non-discriminatory reasons for terminating Igasaki. Namely, Igasaki had a demonstrated record of incompetence and inefficiency in performing his duties and engaged in unprofessional behavior, such as sleeping on the job. His substandard performance resulted in three consecutive negative performance evaluations, two ten-day suspensions, and his placement on a Corrective Action Plan that remained in effect for nearly two years. The evaluations and Corrective Action Plans also provided extensive explanations with specific examples of how Igasaki fell short of expectations. In response, Igasaki can only point to the fact that prior to 2012, he had never received a negative evaluation. However, "the issue is not the employee's past performance but whether the employee was performing well at the time of [his] termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (internal quotation marks omitted); *see also Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("Certainly, earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken."). No matter how well Igasaki performed before 2012, the undisputed evidence shows that he was not meeting IDFPR's reasonable expectations in the years immediately preceding his termination. And because Igasaki has no evidence to show that discriminatory

motives pervaded IDFPR's decision to terminate his employment, IDFPR's motion for summary judgment is granted as to his race, sex, and age discrimination claims.

## II.     ADA Claim

Throughout his tenure at IDFPR, Igasaki dealt with flareups of his gout. While Forester became aware of his condition as early as 2011, Igasaki claims that IDFPR never initiated an interactive process for providing a reasonable accommodation. Moreover, he claims that even when he received a reasonable accommodation shortly before his termination, the accommodation provided was insufficient and further interactive process was necessary.

In October 2011, Igasaki had a gout attack that impaired his ability to walk. (Opp'n at 10; SUF, Ex. B at 69:4–5, Dkt. No. 81-2.) Given his limited mobility, Igasaki's co-workers and members of the Medical Disciplinary Board volunteered to push him around in a mobile office chair when he needed to move about the office. (SUF, Ex. B at 69:4–10; SUF, Ex. D at 000433, Dkt. No. 81-4.) When an IDFPR employee pushed Igasaki into a meeting with Forester, she promptly sent him home. (Opp'n at 10.) She informed Igasaki that if he required a reasonable accommodation, he could request one. (*Id.*) IDFPR's policy was that an employee in need of a reasonable accommodation could make a formal request with a Labor Relations Manager and a human resources professional (PRSF ¶ 76.) Yet, Igasaki did not make a formal request for accommodation until January 26, 2015, after gout in his left hand impaired his ability to type. (PRSF ¶¶ 68, 73; SUF, Ex. D at 000433.) The request attached a doctor's note attesting that Igasaki's gout made use of his left hand and wrist difficult and painful. (SUF, Ex. S, Dkt. No. 81-19.) His request was granted in part and denied in part. (PRSF ¶ 69.) IDFPR provided a reasonable accommodation in the form of an ergonomic keyboard, a tape recorder, and an administrative assistant to type out his documents. (*Id.*) However, Igasaki's request for greater

deadline flexibility was denied because the medical documentation he submitted with his request did not indicate he was unable to handle a normal workload. (*Id.* ¶ 70.)

Igasaki claims that IDFPR denied him a reasonable accommodation both by not initiating an interactive process when Forester became aware of his gout, and later by denying his request for greater flexibility in his deadlines. The ADA requires that an employer provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business" of the employer. 42 U.S.C. § 12112(b)(5)(A). An employee can establish a *prima facie* case of failure to accommodate by showing that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) it failed to reasonably accommodate the disability. *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747 (7th Cir. 2011).

While IDFPR denies that it failed to reasonably accommodate him, Igasaki contends that IDFPR had a duty to initiate the interactive process in October 2011 when Forester became aware of his gout. It is true that once an employer becomes aware of an employee's disability, the ADA "envision[s] a flexible, interactive process by which the employer and employee determine the appropriate reasonable accommodation." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000). And certain Seventh Circuit decisions have held that "[a]fter an employee has disclosed that [he] has a disability, the ADA requires an employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014). At the same time, the Seventh Circuit has made clear that for liability under the ADA to attach, the employee must actually request a reasonable accommodation. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799

F.3d 806, 813 (7th Cir. 2015) ("[A] plaintiff typically must *request* an accommodation for his disability to claim that he was improperly *denied* an accommodation under the ADA."); *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000) ("[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."); *see also Cloe v. City of Indianapolis*, 712 F.3d 1171, 1179 (7th Cir. 2013) ("Absent special circumstances, like severe cognitive disability or mental illness, the employee's initial duty requires that he or she indicate to the employer that she has a disability and desires an accommodation." (internal quotation marks and citation omitted)), *overruled on other grounds by Ortiz*, 834 F.3d 760.

Here, when Forester saw Igasaki attempting to use an office chair as a makeshift wheelchair after a gout attack affected his legs, she informed him that if he required an accommodation, he could request one. Yet, Igasaki did not make a request for an accommodation until January 2015, which was promptly granted in part. Igasaki complains that while Forester told him he could request an accommodation, she did not inform him how to go about doing so. However, IDFPR's employee handbook gave employees instructions on their rights under the ADA and how to request a reasonable accommodation.[3] (SUF, Ex. V., Dkt. No. 81-22.)

---

[3] In his response to the statement of material facts, Igasaki claims that the employee handbook was not distributed or made known to IDFPR employees. However, that is an additional fact that the Court disregards because it was made in the response to the statement of material facts instead of a separate statement of additional facts. It also fails to meet the substance of the factual statement and is disregarded for that reason as well. Moreover, even if the Court were to consider this additional fact, Igasaki mischaracterizes the evidence he cites for support. He cites his deposition testimony where he simply says, "I would point out that this policy manual was probably distributed a long time before. It was probably not in either mine or [Forester's] mind." (SUF, Ex. B at 76:10–13.) This testimony does not indicate that the handbook was not distributed or made known to employees. Instead, it simply shows that neither he nor Forester thought to check it for guidance. Moreover, Igasaki presents no evidence showing that he made any effort to figure out how to request a reasonable accommodation until he had issues with his left hand and wrist. At that point, Forester was able to procure the necessary paperwork for him to request an accommodation. (*Id.* at 73:6–74:10.)

Furthermore, Igasaki sets forth no evidence demonstrating that he made any further effort to pursue an accommodation after that single interaction with Forester.[4]

Igasaki further complains that when he did eventually fill out paperwork and request a reasonable accommodation, it was partially denied without any follow-up. The ADA does not require an employer to provide the exact accommodation that an employee requests. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005). Instead, "the employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations." *Id.* IDFPR did just that when it provided him accommodations for his typing limitations. Nonetheless, Igasaki argues that IDFPR should have engaged in an interactive process before outright denying his other request for flexible deadlines. But the interactive process "is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought." *Rehling*, 207 F.3d at 1015. Thus, for an employer to be liable for failing to engage in the interactive process, its failure must result in the employer not fulfilling its obligation to provide a reasonable accommodation. *Id.* at 1015–16; *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) ("[T]here is no separate cause of action for a failure of [the] interactive process."). That is not the case here. IDFPR provided an appropriate accommodation to help Igasaki with his typing issues. And he does not explain why those accommodations were insufficient. Furthermore, the doctor's note attached to Igasaki's request did not demonstrate that he needed a

---

[4] The Court further notes that Igasaki provided no evidence that his walking impairment arising from his gout was a qualifying disability under the ADA. The Seventh Circuit has held that "[t]o be disabled with regard to the major life activity of walking, the employee must be 'substantially limited in [his] ability to walk, and the limitation must be permanent or long term." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005). Igasaki sets forth no facts showing that his walking impairment was a long-term impairment or that it continued to affect his work performance following his interaction with Forester. Indeed, when Igasaki did eventually request an accommodation related to his gout, his request related solely to his left hand and wrist, and he did not mention any walking impairment. Nor did he present any evidence showing that his employer regarded him as having an impairment of a life activity.

reduced workload or flexible deadlines. (PSRF ¶ 71.) In any case, Igasaki's Corrective Action Plan already gave him permission to request deadline extensions if necessary. (*E.g.*, SUF, Ex. F at 000656, Dkt. No. 81-6 ("(4) Meet all deadlines (Departmental, Chief, ALJ, etc.) ***or submit requests or responses within a reasonable time seeking alternative due dates***." (emphasis added)).) Thus, Igasaki's "displeasure with the way" IDFPR decided on his accommodation "or with its failure to provide the exact accommodation he would have preferred, is irrelevant." *Bunn*, 753 F.3d at 683.

In sum, the undisputed record establishes that Igasaki failed to request a reasonable accommodation during his first gout attack, and therefore IDFPR cannot be liable for not providing him with one or engaging in an interactive process. Then, when Igasaki did request a reasonable accommodation, IDFPR gave him a sufficient accommodation to account for his disability. No further interactive process was necessary because IDFPR effectively accommodated Igasaki's limitations. Consequently, IDFPR's motion for summary judgment is granted as to the ADA claim.

### III.     Retaliation Claim

Finally, Igasaki contends that IDFPR terminated him for filing discrimination charges with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. Title VII prohibits an employer from retaliating against an employee that has filed a charge under Title VII or opposed an unlawful employment practice under the statute. 42 U.S.C. § 2000e-3(a). For Title VII retaliation claims to survive summary judgment, a plaintiff must offer evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (internal quotation marks omitted).

Igasaki's retaliation claim fails initially because he has not actually offered evidence that he engaged in a statutorily protected activity. In his opposition brief, Igasaki asserts that he filed a charge against IDFPR with the Illinois Department of Human Rights on September 11, 2014 and an Equal Employment Opportunity Commission charge on January 23, 2015. However, he provides no evidence of those charges. He does not submit either charge as an exhibit and does not cite to any other proof that he ever filed charges.[5] Even if he did file the charges, he nonetheless fails to demonstrate a causal connection between his termination and those charges. The only evidence he puts forth supporting a causal connection is the fact that he was terminated in March 2015, just a few months after he allegedly filed his EEOC charge. While suspicious timing may demonstrate causation, it is rarely sufficient to defeat summary judgment by itself. *Sklyarsky v. Means-Knaus Partners, LP*, 777 F.3d 892, 898 (7th Cir. 2015). That general rule is particularly applicable here where there was ample evidence of Igasaki's deficient performance, which provided an independent justification for his termination. For these reasons, summary judgment is granted to IDFPR on the retaliation claims.

---

[5] Since filing an Equal Employment Opportunity Commission charge and receiving a right-to-sue letter is a statutory prerequisite for filing a Title VII complaint in federal district court, *Metz v. Joe Rizza Imports, Inc.*, 700 F. Supp. 2d 983, 988 (N.D. Ill. 2010), presumably Igasaki did file a charge. Nonetheless, accepting that such a charge existed, at the summary judgment stage the Court would still need evidence of the date on which the charge was filed. Igasaki cannot claim he was fired in retaliation for his employment discrimination charges without evidence that such charges were filed while he was still an IDFPR employee.

## CONCLUSION

For the foregoing reasons, IDFPR's motion for summary judgment (Dkt. No. 79) is granted in its entirety.

ENTERED:

Dated: September 30, 2018

Andrea R. Wood
United States District Judge